IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| **MICHAEL DELANO ANDERSON,** **#147822,** | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. 2:21-cv-154-RAH-CWB ) |
| **BLAKE TURMAN and** **THOMAS HUGGHINS,** | ) ) ) ) |
| Defendants. | ) |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

**I.   Procedural Background**

Michael Delano Anderson, acting *pro se*, initiated this action by filing a Complaint that raised claims under 42 U.S.C. § 1983.  (Doc. 1).  At the court's direction, Anderson subsequently filed an Amended Complaint (Doc. 5), which is now the operative pleading.  The core allegation is that Sheriff Blake Turman and Jail Administrator Thomas Hugghins violated Anderson's constitutional rights while he was incarcerated at the Covington County Jail.  (*Id*.).  For relief, Anderson requests monetary damages and "[p]roper training for all jail employees."  (*Id*. at p. 4).

On March 15, 2021, the court issued an Order directing the defendants to file a written report addressing Anderson's claims.  (Doc. 6).  On June 24, 2021, the defendants jointly filed a Special Report (Doc. 16), along with supporting evidentiary materials (Docs. 16-1 through 16-8), in which they sought entry of summary judgment.  The defendants thereafter filed a supplement to their Special Report (Doc. 20) and additional evidentiary materials (Docs. 20-1 & 20-2).  On July 8, 2021, the court directed Anderson to file a response to the defendants' filings and include affidavits or statements made under penalty of perjury and/or other evidentiary materials.

(Doc. 21). Anderson filed a response (Doc. 26), and the defendants in turn filed additional evidentiary material (Doc. 38-1).

In its July 8, 2021 Order, the court notified the parties that "the court may at any time [after expiration of the time for Anderson to file a response] and without further notice to the parties (1) treat the special report and any supporting evidentiary materials as a motion to dismiss or motion for summary judgment, whichever is proper, and (2) after considering any response …, rule on the motion in accordance with the law." (Doc. 21 at p. 4). Pursuant to that disclosure, and because the defendants' Special Report presents arguments for dismissal, the undersigned Magistrate Judge will now treat the Special Report as a motion to dismiss and recommend that the motion be granted due to Anderson's failure to exhaust administrative remedies prior to filing suit.[1]

## II. The Exhaustion Requirement

The Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions under section 1983 … by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).[2] Exhaustion of available administrative remedies thus is a mandatory precondition to suit. *See Booth v. Churner*, 532 U.S. 731, 739 (2001). The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or

---

[1] Although the defendants request that the court treat their Special Report as a motion for summary judgment (Doc. 16 at p. 27), "an exhaustion defense … should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment." *Bryant v. Rich*, 530 F.3d 1368, 1374-75 (11th Cir. 2008) (internal quotations and citations omitted).

[2] "42 U.S.C. § 1997e, which is designed to deter the filing of frivolous litigation against prison officials, applies to both pretrial detainees and convicted prisoners." *Kingsley v. Hendrickson*, 576 U.S. 389, 402 (2015).

particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "The requirement is not subject to waiver by a court, or futility or inadequacy exceptions." *Mathews v. Walters*, No. 3:23-cv-10264, 2023 WL 8881170, *2 (N.D. Fla. Dec. 4, 2023) (citing *Booth*, 532 U.S. at 741 n.6).

To properly exhaust administrative remedies, an inmate must "us[e] all steps" in the administrative process and comply with all "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). If an inmate has filed "an untimely or otherwise procedurally defective administrative grievance or appeal," he has not properly exhausted his administrative remedies. *Id.* at 83-84. And when an inmate fails to properly exhaust available administrative remedies before filing suit, the court <u>must</u> dismiss the action. *See Chandler v. Crosby*, 379 F.3d 1278, 1286 (11th Cir. 2004).

Deciding a motion to dismiss for failure to exhaust administrative remedies involves two steps:

> First, the court looks to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, takes the plaintiff's version of the facts as true. If, in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed.

*Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008) (citing *Bryant*, 530 F.3d at 1373-74). "If the complaint is not subject to dismissal at the first step, where the plaintiff's allegations are assumed to be true, the court then proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion." *Id.* (citing *Bryant*, 530 F.3d at 1373-74, 1376). "Once the court makes findings on the disputed issues of fact, it then decides whether under those findings the prisoner has exhausted his available administrative remedies." *Id.* at 1083. "The defendants bear the burden of proving that the plaintiff has failed to exhaust." *Id.* at 1082 (citing *Jones v. Bock*, 549 U.S. 199 (2007)).

3

### III. The Parties' Filings

#### a. Allegations in the Amended Complaint

On September 4, 2020, Defendants Turman and Hugghins "had the jail blocks A & B separated with the two major cities in the County in each block (A-Block—Opp), (B-Block—Andalusia)." (Doc. 5 at p. 3). "[T]hese two cities are rivalry cities that have never gotten along and stay fighting with each other." (*Id*. at pp. 3 & 5). "The Sheriff and Captain knows this, and knows not to place one around the other in the same blocks." (*Id*. at p. 5). Anderson is from a city "west of Andalusia," which is "considered by Opp … to be part of Andalusia." (*Id*.). Nevertheless, when given the choice of which block to go to, Anderson chose A-Block, as he was unaware of the Opp/Andalusia designations. (*Id*. at p. 3).

On September 8, 2020, Anderson "was jumped [by two other inmates] and stabbed several times in the head, shoulder, back, and hand." (*Id*. at p. 5). One correctional officer "rolled the door for [Anderson] to exit," while another stood at the door. (*Id*.). One of the inmates who attacked Anderson "attempt[ed] to continue stabbing [him]," and neither officer intervened. (*Id*.). After chasing Anderson, the other inmate was "talked back in his block" and Anderson "was moved to B-Block for Andalusia inmates." (*Id*.). After Anderson was moved to B-Block, Defendant Hugghins came to talk to him. (*Id*. at pp. 3 & 6). Anderson stated that he was "all bruised up" and that one of his assailants "took [his] canteen." (*Id*. at p. 6). Anderson "was never taken to see the nurse, when it was clear that [he] needed to," and his assailants were never punished. (*Id*.).

On September 10, 2020, Anderson met with Officers Tyler Patterson and Ken Harris and told them about his September 8 assault. (*Id*. at p. 3). Officer Harris stated, "[I]'m tried [sic] of these guys, we bought [sic] to start an investigation right f***ing now!" (*Id*. at p. 6). Anderson

4

"was then taken across the street to the C.C.S.O." where Officer Harris told Sergeant Hamm: "[S]omething has to be done over at the Jail before someone gets killed[.] No one over there has been properly trained on running that Jail and they kept letting [Anderson's assailants] do what they want." (*Id*.). Sergeant Hamm took Anderson's statement, and Investigator McCraw took pictures and another statement. (*Id*.). Investigator McCraw stated: "[W]e [are] going to press charges for theft of property and 3rd degree assault." (*Id*. at p. 7).

Defendant Turman then told Anderson to go get a body chart. (*Id*.). However, Anderson was "escorted back to the Jail and put back in B-Block with no body chart [and] no medical attention." (*Id*.). Anderson filled out several sick call forms, and he was "finally given a blood test" on October 6, 2020, at which time it was revealed that he had Hepatitis C. (*Id*.). Thereafter, Anderson was sent for a CAT scan. (*Id*.). The nursing staff said that they would not treat Anderson's Hepatitis C and that Anderson's "headaches were coming from the blows to [his] head." (*Id*.). On December 16, 2020, Anderson was given an eye examination, and "James Barton O.D. … said most of [Anderson's] vision problems came from blows to [his] head." (*Id*.). Anderson at that point filed a grievance stating that the defendants "need training," and Defendant Hugghins "threaten[ed] to lock [him] up." (*Id*.).

      b.      **The Defendants' Special Report**

The defendants assert that the Covington County Jail had an inmate grievance procedure in place that Anderson had access to but did not follow. (Doc. 16 at p. 10). According to the defendants, Anderson was required to have filed a grievance on an Inmate Grievance Form within 48 hours of the September 8, 2020 incident. (*Id*.). They allege, however, that Anderson did not submit a grievance until at least late October or early November 2020 (*Id*. at pp. 11-12)

5

and that Anderson did not otherwise submit any documentation regarding the incident until he filled out a sick call slip on October 3, 2020 (*Id*. at p. 15).

In an affidavit attached to the Special Report[3], Defendant Hugghins explained the inmate grievance procedure as follows:

> 12.　The Covington County Jail Inmate Handbook is made available to all inmates on the jail kiosk.
>
> 13.　Chapter 9 of the Covington County Jail Inmate Handbook deals with Inmate Grievances.
>
> 14.　If an inmate has an issue, the first action the inmate should take is to try and resolve the problem through the use of an inmate request form. If such efforts are unsuccessful, the inmate should submit his or her grievance on an Inmate Grievance Form within 48 hours of the incident to the pod officer.[]
>
> 16.　The inmate's grievance will be investigated and answered, in writing, within 48 hours of the time the grievance is received, excluding weekends and holidays.
>
> 17.　Grievances are first answered by the appropriate staff at the lowest level in the chain of command.
>
> 18.　If the inmate is not satisfied with the first answer to the inmate's grievance, the inmate may send a grievance to the next higher command level.
>
> 19.　The inmate may continue to send the grievance through the chain of command, up to the Sheriff, who will make the final decision.[]
>
> 21.　The current Covington County Jail Inmate Handbook states that the inmate should access the Inmate Grievance Form on the kiosk. However, Covington County Jail had to move away from inmates filing grievances utilizing the kiosk due to the fact that the inmates were improperly using the kiosk to communicate with one another.
>
> 22.　Covington County Jail has an unwritten policy that requires when an inmate is booked in, the booking officer will verbally inform the inmate that they can file

---

[3] In the event it is necessary to resolve a factual dispute regarding exhaustion, the court may consider facts outside of the pleadings. *See Trias v. Fla. Dep't of Corr.*, 587 F. App'x 531, 535 (11th Cir. 2014) ("The [district] judge properly may consider facts outside of the pleadings to resolve a factual dispute as to exhaustion where doing so does not decide the merits, and the parties have a sufficient opportunity to develop the record.") (citation omitted).

a grievance by hand, using the same procedures laid out above which can be found in the Inmate Handbook located on the kiosk. The only difference is that inmates use a handwritten form, not the electronic form.

(Doc. 16-2; *see also* Docs. 16-5 & 16-8).

Anderson's jail and medical records attached to the Special Report reflect that on September 6, 2020, two days prior to his alleged assault, Anderson filled out a sick call slip stating: "I have arthritis & [illegible] in my knee and ankles which made me fall because of these slides[.] I fell and I have … big bruises in my hand and side." (Doc. 16-3 at p. 44). On September 7, 2020, Anderson filled out a Patient's Consent for Treatment form to allow him to receive treatment, and he received a medical screening the same day. (*Id.* at pp. 42-43). On October 3, 2020, Anderson filled out another sick call slip, stating in part: "On Sept 8, 2020[,] I was stabbed multiple times in A-Block as a C/O stood and watched[.] These wounds are hurting it seems from the inside." (*Id.* at p. 40). Anderson was seen on October 5, 2020. (*Id.*)

On October 10, 2020, Anderson filled out a third sick call slip, stating: "I can't see do [sic] to being stabbed in the head. I keep writing these sick calls and the nurse will not see me[.] I'm loosing [sic] weight they still don't see me[.] I was stabbed[.]" (*Id.* at p. 35). On October 11, 2020, Anderson filled out a fourth sick call slip, stating in part: "I was stabbed in the head and now the nurse say I got Hept C! I didn't have none of these problems before I got stabbed and not giving any medical attention for over 30 days." (*Id.* at p. 36). Anderson was seen on October 14, 2020. (*Id.* at pp. 33 & 35). On November 25, 2020, Anderson filled out a fifth sick call slip, stating: "On Sept 8, I was stabbed in the head and back. I have migraine headaches, and Hept C from the stabbing, and also high blood pressure. I need medical attention." (*Id.* at p. 29). On November 27, 2020, Anderson filled out a sixth sick call slip, stating: "On Sept 8, 2020,

I was stabbed in the head and it has impaired my vision. I can[']t see and I need to see the eye doctor about my vision." (*Id*. at p. 26). Anderson was seen that same day. (*Id*. at p. 28).

On December 2, 2020, Anderson filled out a seventh sick call slip, stating in part: "I'm having severe chronic migrain[e]s 4 to 5 times a week … every [sic] since I got stabbed in the head on Sept 8, 2020." (*Id*. at p. 24). He was seen on December 3, 2020. (*Id*. at pp. 22-23). Finally, on December 7, 2020, Anderson submitted his first inmate request form pertaining to the September 8 incident. (Doc. 16-1 at p. 20). Additionally, Correctional Officer Natalie Brown—who was present during the September 8 incident—avers that she does not remember Anderson filing any grievances regarding the incident in September 2020; the only grievance she recalls receiving was submitted "months after the incident took place." (Doc. 16-4 at p. 4).

  c. **Anderson's Response**

The court directed Anderson to file a response specifically addressing the defendants' exhaustion argument as raised in the Special Report. (Doc. 21). In his response, Anderson did not address the exhaustion argument other than to state: "I turned in many sick call slips[.]" (Doc. 26 at p. 2).

**IV.** **Discussion**

The defendants have alleged that Anderson failed to follow the inmate grievance procedure in place at the Covington County Jail, *i.e.*, that Anderson did not file an Inmate Grievance Form within 48 hours of the underlying incident. (*See* Doc. 16-4 at p. 4). In response, Anderson does not dispute the existence of the inmate grievance procedure, that the procedure was available to him,[4] or that he failed to follow the procedure. He simply states that he "turned in many sick call

---

[4] The Supreme Court has recognized three circumstances in which an administrative remedy is considered unavailable to an inmate. *See Ross v. Blake*, 578 U.S. 632, 643 (2016). First, a remedy is unavailable when "it operates as a simple dead end" because prison officials are "unable or


slips." (Doc. 26 at p. 2). This case thus is due to be dismissed for a failure to exhaust available administrative remedies. *Woodford*, 548 U.S. at 83-84, 90-91; *Turner*, 541 F.3d at 1082; *Chandler*, 379 F.3d at 1286.

## V.     Conclusion

Accordingly, the undersigned Magistrate Judge hereby **RECOMMENDS** as follows:

1.     that the defendants' Special Report (Doc. 16), which is construed as a motion to dismiss, be granted; and

2.     that this case be dismissed due to Anderson's failure to exhaust his administrative remedies.

It is **ORDERED** that any objections to this Recommendation must be filed by **January 24, 2024**. An objecting party must identify the specific portion of any factual findings or legal conclusions to which objection is made and must describe in detail the basis for the objection(s). Frivolous, conclusive, or general objections will not be considered.

After receiving all objections, the District Judge will conduct a *de novo* review of the findings or recommendations to which objection is made. The District Judge may accept, reject, or modify the Recommendation or may refer the matter back to the Magistrate Judge with instructions for further proceedings. *See* 28 U.S.C. § 636(b)(1)(C). A party shall be deemed to have waived the right to challenge on appeal a District Judge's order to the extent it is based upon unobjected-to findings or recommendations. The court on appeal may review unobjected-to

---

consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, a remedy is unavailable if the grievance process is "so opaque that it becomes, practically speaking, incapable of use." *Id*. This occurs when "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* at 644. Finally, a remedy is unavailable if "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. Anderson has made no allegations sufficient to invoke any of those circumstances.

factual and legal conclusions only for plain error if necessary in the interests of justice. *See* 11th Cir. R. 3-1.  No party may appeal this Recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  A party may appeal only from a final judgment ultimately entered by the District Judge.

    **DONE** this the 10th day of January 2024.

_____
**CHAD W. BRYAN**
**UNITED STATES MAGISTRATE JUDGE**